IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| TERRY L. COURTNEY, )<br>)<br>    Plaintiff, )<br>) <br>  v. )<br>)<br>MICHAEL J. ASTRUE, Commissioner of Social )<br>Security, )<br>)<br>    Defendant. ) | CV 06-6193-AS<br><br>FINDINGS AND<br>RECOMMENDATION |

ASHMANSKAS, Magistrate Judge:

## INTRODUCTION

Plaintiff Terry Courtney brings this action for judicial review of a final decision of the Commissioner of Social Security denying his applications for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act. The court has jurisdiction under 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's decision should be remanded for further proceedings.

1 - FINDINGS AND RECOMMENDATION

**BACKGROUND**

Courtney was born July 10, 1957. Tr. 71.[1] He completed the ninth grade and has past work experience as a janitor, stock clerk, security guard, and warehouse person. Tr. 82, 103, 456. Courtney asserts disability based on a combination of conditions including morbid obesity, coronary artery disease, obstructive sleep apnea, and carpal tunnel syndrome. He applied for DIB on March 16, 2004, and SSI on December 12, 2004. Courtney satisfied the insured status requirements for DIB benefits under Title II through December 31, 2008. Tr. 17. He must establish that he was disabled on or before that date to prevail on his DIB claim. 42 U.S.C. § 423(a)(1)(A), *Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998). Courtney's applications were denied and an administrative hearing was held before an Administrative Law Judge (ALJ) on October 21, 2005. The ALJ issued an opinion on March 24, 2006, finding Courtney not disabled, which is the final decision of the Commissioner.

**DISABILITY ANALYSIS**

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. *Bowen v. Yuckert*,

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. At step three, there is a conclusive presumption that the claimant is disabled if the Commissioner determines that the claimant's impairments meet the duration requirement and meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen v. Yuckert,* 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). The criteria for these listed impairments are enumerated in 20 C.F.R. Pt. 404, subpt. P, app. 1 (listing). Courtney challenges the ALJ's determination that his conditions did not meet or equal a listing.

If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by her impairments. 20 C.F.R. §§ 404.1545, 416.945; Social Security Ruling (SSR) 96-8p. Courtney challenges the ALJ's determination of his RFC. At step four, the Commissioner must determine whether the claimant retains the RFC to perform work he has done in the past. If the ALJ determines that he retains the ability to perform his past work, the Commissioner will find the claimant not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). Courtney challenges the ALJ's finding that he is able to perform his past work.

## **THE ALJ's FINDINGS**

The ALJ found that Courtney has medically determinable impairments that significantly limit his ability to perform basic work activities. He determined Courtney had impairments that are "severe in combination: morbid obesity; coronary artery disease (CAD), status-post stenting; carpal tunnel syndrome (CTS), status post surgical release; sleep apnea controlled with Bi-PAP; asthma (controlled); and gout (controlled)." Tr. 19.

After determining that Courtney's conditions did not meet or equal an impairment listed in 20 C.F.R. pt. 404, subpt. P, app.1, the ALJ assessed his RFC. He determined Courtney could work at a light exertional level with limitations of no prolonged standing and walking, the ability to stand/walk at least two hours of an eight hour day, and occasionally climb ramps, stairs, ladders, and scaffolds. The ALJ also determined Courtney was restricted from excessive exposure to smoke, dust, and fumes. Tr. 22. The ALJ asked the vocational expert (VE) testifying at the hearing to evaluate whether a person with this RFC could perform Courtney's past relevant work. The VE testified he could return to his job of security guard as he performed it but not as the job is listed in the Dictionary of Occupational Titles (DOT). Tr. 22, 457. The ALJ also asked the VE to determine if a person with Courtney's RFC could perform other work in the economy. The VE indicated there were jobs as an information clerk, touch up screener, and food and beverage clerk. Tr. 23, 460-461. The ALJ determined Courtney could perform his past relevant work and other work in the national economy and was not disabled within the meaning of the Social Security Act. Tr. 24.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The ALJ is responsible for "determining credibility, resolving conflicts in the medical testimony and resolving ambiguities." *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001)(citations omitted). The court must weigh all of the evidence, whether it supports or detracts

from the Commissioner's decision. *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." *Andrews v. Shalala*, 53 F.3d at 1039-1040.

## DISCUSSION

Courtney asserts that the ALJ erred by failing to follow Social Security Regulation (SSR) 02-1p and properly consider the effects of his morbid obesity on his other impairments and his ability to work. He also asserts the ALJ improperly rejected the opinion of his treating physician. Courtney contends the ALJ also failed to properly consider his testimony. He also contends the ALJ failed to consider the combination of his untreated impairments during a closed period in 2004 to 2005.

### I.    Medical Background

Courtney began receiving treatment from Dr. Englander, a neurologist, in July 2002. Dr. Englander noted Courtney had glaucoma, hypertension, shortness of breath, exogenous obesity, a previous head injury, and possible obstructive sleep apnea. He ordered a sleep apnea test . Tr. 179-181. Dr. Rice, Courtney's primary care physician, treated him for carpal tunnel syndrome, foot pain, asthma, hypertension, glaucoma post-surgery, and high cholesterol. Tr. 305, 308. A sleep apnea test conducted September 8, 2002, indicated Courtney had severe obstructive sleep apnea. Tr. 176-178. Dr. Englander conducted a further sleep test using a Continuous Positive Airway Pressure Machine (C-PAP) in December 2002. That test indicated a good response to the C-PAP.

Tr. 173-175. However, Courtney was not able to tolerate the C-PAP, so Dr. Englander wrote a letter to Courtney's insurer on February 4, 2003, requesting a waiver for a Bilevel Positive Airway Pressure Machine (Bi-PAP). Dr. Englander noted the sleep test indicated Courtney's oxygen saturation was reduced to eighty percent. He also noted Courtney's weight was a contributing factor. Tr. 257.

Dr. Rice continued to treat Courtney with medications for his various conditions, and indicated there was a problem getting the Bi-Pap machine. He noted Courtney's weight in May 2003 was 319, and in September 2003, was 300. Tr. 294-296. In February 2004, Dr. Englander noted Courtney's weight was 332 and that Courtney continued to have problems using the C-PAP. Dr. Englander suggested Courtney apply for disability due to his multiple illnesses. Tr. 254-255. In March and April 2004, Dr. Lynch, an orthopedist, treated Courtney with injections for his right carpal tunnel syndrome (CTS) following a positive nerve compression test. Tr. 197-199, 355-357.

Dr. Eder, a state agency consultant, developed an RFC for Courtney on April 4, 2004. The RFC was for a light level of exertion with a few restrictions with respect to climbing ladders, ropes, scaffolds, stairs, and ramps. Tr. 207- 211. Dr. Pritchard, another state agency consultant, confirmed the RFC in September 2004. *Id.* Dr. Rice noted Courtney's weight was 340 in May 2004, and that Courtney had various arthralgias in addition to his other conditions. Tr. 291. Dr. Hoellrich began treating Courtney for his CTS in June 2004, and prescribed night splinting if his symptoms worsened following cortisone injections. Tr. 354.

In September 2004, Dr. Rice noted Courtney looked tired, had borderline blood pressure, chest pain on exertion, and ordered a stress EKG test. Tr. 290. Courtney had a positive stress test in October 2004. His weight was 354 pounds and he had taken nitroglycerine for chest pain. Tr.

289. Dr. Englander noted Courtney's weight was 363 pounds on November 9, 2004. He noted the CTS was now bilateral and Courtney's weight probably made the CTS worse. Dr. Englander also noted the BiPAP machine was controlling Courtney's sleep apnea. He ordered nerve conduction studies and recommended follow up with an orthopedic surgeon. Tr. 252-253.

On November 11, 2004, Dr. Gory, a cardiac surgeon, performed a cardiac catheterization and angioplasty. He found elevated left ventricular end diastolic pressure, 80% stenosis in the left anterior descending artery with 90% on the second diagonal artery, 50% on the circumflex and 40% on the right. Tr. 220-221. Dr. Gory noted,

> Terry underwent an extensive intervention. His LAD was stented with 2 stents in the mid portion. There was an internal tear more proximally and that was the reason for the second stent . . . There is additional disease scattered throughout his coronary tree. We will continue a medical approach. He had fairly extensive hypertension during his intervention. I therefore continued his Lisinopril and Atenolol. He is already on a diuretic. I will add Plavix 75 mg. for 6 months.

Tr. 269.

Dr. Englander found the electro-diagnostic study of Courtney's bilateral CTS indicated severe right median nerve neuropathy at the wrist and mild to moderate neuropathy of the left median nerve. Tr. 261. In December 2004, Drs. Gory and Hoellrich agreed Courtney would not be able to have CTS surgery while he was taking the medication Plavix, which was prescribed following his catheterization. Tr. 267. Dr. Rice treated Courtney for acute gout in January 2005, and noted his conditions of CAD, status post-stents, marked obesity, hypertension, asthma, glaucoma, sleep apnea, high cholesterol, GERD and CTS. He noted the CTS surgery was needed but it would have to be delayed until the Plavix was decreased. Tr. 285-286.

Dr. Gory performed another cardiac catheterization and inserted a "coated drug-eluting stent in both the diagonal and LAD" on February 7, 2005. Tr. 242. He noted Courtney had angina,

7 - FINDINGS AND RECOMMENDATION

shortness of breath, chest tightness and gout. Tr. 242-246. Dr. Rice treated Courtney on February 16, 2005, for acute situation reaction with anxiety and prescribed Klonopin. His notes state, "Question of permanent disability." Tr. 284. Dr. Gory noted in his follow up examination of Courtney on February 24, 2005, that the stents had resolved Courtney's chest pains, but it was necessary to continue the blood thinner, Plavix. As a result, Courtney's CTS surgery could not be performed. Tr. 266. Dr. Rice treated Courtney for acute gout on March 2, 2005, and noted Courtney was in cardiac rehabilitation and wrote a note stating no work or work search for at least two months. Tr. 282.

Dr. Englander wrote a letter on March 15, 2005, stating, "I believe that based on his current chronic medical conditions for which there is no additional treatment, that he is and will remain permanently disabled for future employment." Tr. 251. On March 22, 2005, Courtney completed cardiac rehabilitation and his blood pressure was improved. However, he was unable to do home exercises due to his gout. Tr. 272. Dr. Rice noted in March and April 2005, that Courtney had three episodes of gout over a three-month period, was sleepy a great deal of the time, and his anxiety had decreased. Tr. 280-281.

Dr. Hoellrich performed carpal tunnel release surgery on Courtney's right hand in June 2005. Tr. 337-340. Dr. Hoellrich noted in July 2005, that Courtney had pain on gripping over the "ring finger A1 pulley." He noted "possible early RD IV trigger finger." Tr. 346. On August 1, 2005, Dr. Rice noted Courtney had chest pains but believed it was due to the stress related to the death of Courtney's father's and his imminent homelessness. Tr. 400-401. On August 19, 2005, Dr. Rice noted Courtney was living in his car and had a recurrence of gout, but was "more relaxed." Tr. 412. Dr. Rice noted Courtney had no electrical source so was keeping Courtney's C-PAP

machine in his office. He noted, "Talked to him about possibility of going to the mission where he can use his C-PAP machine with his other medications." *Id.* Dr. Hoellrich recommended surgery for Courtney's left hand carpal tunnel syndrome and performed the surgery on October, 5, 2005. Tr. 404-407.

## II.     Obesity Analysis

Courtney argues the ALJ failed to analyze the effects of his morbid obesity as required by SSR 02-1p. The court agrees. SSRs are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(2); *See, Heckler v. Edwards,* 465 U.S. 870, 874 n. 3 (1984). The Social Security Administration (SSA) recognizes that obesity is a medically determinable impairment and cautions adjudicators that "the combined effects of obesity with other impairments can be greater that the effects of each of the impairments considered separately." SSR 02-1p, 2000WL 628049. Adjudicators are required to consider obesity in determining the severity of impairments, as a factor in whether a condition meets or equals a listing, and in the determination of an RFC. *Id.*

The ruling states the National Institutes of Health (NIH) established Clinical Guidelines with medical criteria for the diagnosis of obesity using the Body Mass Index (BMI). SSR 02-1p*,* Question 1. These guidelines recognize three levels of obesity.[2] Level III, or extreme obesity, is composed of individuals with BMIs greater than or equal to 40. These individuals have the greatest risk for developing obesity-related impairments and complications with other conditions. This is

---

[2]"BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m2). For adults, both men and women, the Clinical Guidelines describe a BMI of 24-29.9 as 'overweight' and a BMI of 30.0 or above as 'obesity.'
The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9." SSR  02-1p, Question 1, 2000 WL 628049.

9 - FINDINGS AND RECOMMENDATION

especially true of conditions such as heart disease, respiratory diseases, musculoskeletal impairments, and sleep apnea. SSR 02-1p, Question 2. Courtney's impairments include heart disease, asthma, foot problems, CTS, and sleep apnea.

The record indicates Courtney is five foot seven inches and his weight varies between 319 and 363 pounds, although it has been as low as 300 pounds. Tr. 253, 294, 296. The ALJ noted that at the time of the hearing Courtney's weight was 330 pounds. Tr. 19. When Courtney weighs 363 pounds his BMI is 56.8, when he weights 330 pounds it is 51.7, and when he weighs 300 pounds it is 47.[3] All of these are well above the cut off level of 40 for Level III, extreme obesity.

The ALJ found at step two that Courtney had a combination of impairments that were severe, and he included morbid obesity in those impairments. At step three, obesity is a factor in determining whether an impairment or combination of impairments meet a listing as it may increase the severity of the impairments. SSR 02-1p, Question 7. Obesity may also be a factor in determining equivalence:

> We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected.

*Id.*

---

[3]Body Mass Index Calculator, National Heart, Lung and Blood Institute, National Institutes of Health, U.S. Department of Health and Human Services available at www.nhlbisupport.com/bmi/bmiscale/htm (last viewed June 28, 2007).

At step three the ALJ did not mention obesity in his analysis. The ALJ addressed whether Courtney's argument that his Coronary Artery Disease (CAD) met or equaled listing 4.04C, and stated, "when his CAD is considered in combination with his other impairments, his CTS and other impairments do not lead to significant limitations suggested by the listing." Tr. 19. The Social Security Regulations related to cardiovascular disease listings state, "when determining whether an individual with obesity has a listing-level impairment or combination of impairments . . . adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R. Pt. 404, subpt. P, app. 1, 4.00F.

In determining Courtney's RFC, the ALJ listed each impairment separately and determined if the single impairment had functional limitations. Tr. 20-21. The ALJ discussed Courtney's foot problems, sleep apnea, CTS, CAD, asthma, gout, glaucoma, and anxiety. However, contrary to the requirements of SSR 02-1p and social security regulations, there is no indication the ALJ analyzed Courtney's extreme obesity or its effect on the combination of his conditions. In determining an RFC, the ruling states:

> The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day  Obesity may affect an individual's social functioning. . . Individuals with obesity may have problems with the ability to maintain function over time. . . In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be especially true in cases involving sleep apnea.

SSR 02-1p, Question 8. The medical record indicates Courtney complained of fatigue and drowsiness. Tr. 280-281. This effect of obesity was discounted by the ALJ who stated Courtney did not appear drowsy at the hearing. He noted, "While the hearing was a short-lived, one-time

11 - FINDINGS AND RECOMMENDATION

situation and cannot be considered conclusive . . . it is given some weight in making a determination as to his credibility and residual functional capacity. Tr. 21.

The Commissioner argues that the ALJ considered Courtney's impairments and the effect of his extreme obesity in developing the RFC because Courtney was limited to standing and walking for two hours out of an eight-hour day. The ALJ gave "substantial weight" to the RFC developed by the state agency consultants. Tr. 22. This RFC was developed before Courtney's two cardiac catheterizations with stents, angioplasty, and CTS nerve compression tests. A more recent medical determination would be more reliable in determining a proper RFC.

ALJ's are required to evaluate the effects of obesity based on the information in the case record. *Burch v. Barnhart*, 400 F. 3d 676, 682 (9th Cir. 2005), citing SSR 02-01p. The record indicates Courtney was not just obese, but he had extreme obesity. Courtney also has the type of other impairments specifically noted in the SSR as most likely to be made worse by extreme obesity. The ALJ had a responsibility to consider the "interactive effect" of Courtney's extreme obesity and his other conditions. *Celaya v. Halter,* 332 F.3d 1178,1182 (9th Cir. 2003). The ALJ's step three and RFC analysis fall short of this standard. The ALJ separately analyzed Courtney's conditions for functional limitations and failed to consider the effect of his extreme obesity on his combined impairments as required by SSR 02-1p and social security regulations. This evaluation must be completed on remand.

//
//
//

## **RECOMMENDATION**

Based on the foregoing findings and conclusions, the Commissioner's final decision should be remanded for further proceedings.

## **SCHEDULING ORDER**

Objections to the Findings and Recommendation, if any, are due July 17, 2007. If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, the response is due no later than July 31, 2007. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

IT IS SO ORDERED.

DATED this 2nd day of July, 2007.

      /s/Donald C. Ashmanskas
     DONALD C. ASHMANSKAS
     United States Magistrate Judge

13 - FINDINGS AND RECOMMENDATION